**UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION**

IN RE:                                          )
                                                )
SOUTHEASTERN MATERIALS, INC                     )
                                                )
PO BOX 279                                      )
ALBEMARLE, NC 28002-0279                        )        Case No. B-09-52606 C-7W
                                                )
            Debtor.                             )
_____)
                                                )
W. JOSEPH BURNS, TRUSTEE,                        )
                                                )
                                                )
            Plaintiff,                          )
vs.                                             )
                                                )
TONY M. DENNIS,                                 )        Adv. No. 11-6033
                                                )
BETTY D. LAMBERT,                               )        Adv. No. 11-6034
                                                )
DENNIS-LAMBERT INVESTMENTS                       )        Adv. No. 11-6035
LIMITED PARTNERSHIP,                            )
                                                )
CHRIS C. LAMBERT,                               )        Adv. No. 11-6036
                                                )
MARIA D. DENNIS,                                )        Adv. No. 11-6037
                                                )
            Defendants.                         )
_____)


**<u>MEMORANDUM OPINION</u>**


        At issue in this adversary proceeding is whether the Court has authority to enter final

judgment on the causes of action asserted in these adversary proceedings. On September 8, 2011,

the Court entered an order instructing the parties to either file a written consent to the Court's

authority to enter final judgment on the asserted claims, or file briefs outlining their respective positions as to whether and how the Supreme Court's ruling in <u>Stern v. Marshall</u>, 564 U.S. --, 131 S. Ct. 2594 (2011), affects this Court's authority to enter final judgment.

The Court held a hearing in these matters on October 28, 2011, in Winston-Salem, North Carolina, at which time the Court took the matter under advisement. The facts in each of the cases are similar or are closely related; therefore, this Court will address all five cases together in this consolidated opinion and issue separate orders for entry in each case.

## I. BACKGROUND

On December 30, 2009, Southeastern Materials, Inc. (the "Debtor"), a North Carolina corporation in the business of manufacturing trusses, filed a Chapter 11 bankruptcy. On June 2, 2010, W. Joseph Burns was appointed as the Chapter 11 trustee for the Debtor. On July 30, 2010, the case was converted to a case under Chapter 7 of the Bankruptcy Code, and Mr. Burns became the Chapter 7 trustee (the "Trustee"). On May 19, 2011, the Trustee filed five complaints commencing these adversary proceedings against Betty D. Lambert ("Betty"), Chris C. Lambert ("Chris"), Maria D. Dennis ("Maria"), Tony M. Dennis ("Tony"), and the Dennis-Lambert Investments Limited Partnership ("DLI" and together with Betty, Chris, Maria, and Tony, the "Defendants"). The Debtor is a closely-held corporation: Betty and Tony, the Secretary and President of the Debtor, are siblings. Chris, Betty's son, and Maria, Tony's daughter, are employed by the Debtor.  Together, Betty and Tony own 98 percent of the Debtor. The remaining two percent is owned by Kay Dennis ("Kay"), Tony's spouse. Betty's husband, Charles A. Lambert ("Charles"), is also alleged to have participated in several of the business deals addressed by the Complaint, although he is not named as a defendant. The Trustee alleges that Betty, Tony, Charles, Kay, Maria,

and Chris were insiders of the Debtor because they were and are officers or directors of the Debtor and/or relatives of officers and directors of the Debtor.

A. Transfers to Defendants

The Trustee alleges that from December 30, 2005 through December 29, 2009, the Debtor transferred $654,222 to Betty, $164,715 to Tony, $102,836 to Chris, and $183,715 to Maria, allegedly without consideration to the Debtor. Tony, Betty, and Chris filed proofs of claim. The Trustee seeks to disallow Betty's and Tony's claims but does not object to the claim filed by Chris. Neither Maria nor DLI filed a proof of claim.

The Debtor's financial statement ending January 31, 2008, contains a line-item entry for "Officers and Others" in the amount of $764,235. In a statement for the 2007 fiscal year, the same line item was $17,558, some $746,677 less than in 2008. The Trustee alleges that inasmuch as Betty and Tony were officers of the Debtor at the time that the receivables were generated and provided no consideration to the Debtor for the transfers, at least a portion of the $764,235 is still owed to the Debtor by Betty and Tony. Both Betty and Tony are further alleged to have transferred substantial sums—indeed, more than $703,017—from the Debtor to one another and to Maria, Chris, DLI, Custom Wood, and First Bank (one of the Debtor's largest creditors). Many of these transfers were excluded from the Debtor's Statement of Financial Affairs.

B. The Dennis-Lambert Investments Limited Partnership

The Debtor had significant dealings with other entities that are managed and owned by the Defendants, including DLI. Tony and at least one other Defendant formed DLI on October 18, 2000, for the purpose of acquiring and holding real estate investments. From DLI's formation until the Petition Date, the Debtor served as the general partner of DLI and owned a two percent interest.

Tony, Betty, and unspecified members of their respective families own the remaining 98 percent as limited partners. From December 30, 2005, through December 29, 2009, a total of $459,056 was transferred by the Debtor to DLI.

According to the Trustee's Complaint, the Debtor added substantial value to DLI as the business's general partner by enabling DLI to obtain real estate acquisition loans that would otherwise have been unattainable. The Debtor's substantial revenue stream, in combination with its asset and customer base, made DLI an attractive borrower to banks and other lenders, who typically require a revenue-producing obligor. Specifically, the Trustee alleges that the Defendants exploited the Debtor's position in order to obtain property located at Highway 904 in Tabor City, North Carolina, where the Debtor's second manufacturing facility is located (the "Tabor City Facility"). On October 31, 2000, the Debtor, together with Tony, Kay, Charles, and Betty, executed a promissory note in favor of First Bank in the original principal amount of $800,000 (the "October 2000 Note"). The Complaint alleges that although the Debtor never received any portion of the proceeds from the October 2000 Note and never owned any of the property at the Tabor City Facility (owned entirely by Tony, Kay, Charles, and Betty), the Debtor nevertheless paid substantially all of the payments on the October 2000 Note from its own funds. On February 14, 2002, the Defendants transferred the facility to DLI. The Complaint further alleges that the Debtor funded principal and interest payments on DLI acquisition loans other than the October 2000 Note for the purpose of acquiring real estate investments, but which served no legitimate purpose for the Debtor.

C. Custom Wood & Masonry Structures, Inc.

In addition to their involvement in the management of the Debtor, Betty and Tony founded and managed Custom Wood & Masonry Structures, Inc. ("Custom Wood"), a North Carolina

corporation in the business of installing trusses. Chris is Vice President of Custom Wood; Maria is an employee. Betty, Tony, Chris, and Maria each own a 25 percent interest in Custom Wood. The purpose of Custom Wood was to purchase trusses and other wood products manufactured by the Debtor and install such products under turnkey framing contracts with third parties. The venture was apparently unsuccessful. The Trustee alleges that as far back as January 2008, Custom Wood had no significant assets of its own and a history of losing money. At the time of the Debtor's filing, Custom Wood had ceased operations and had no assets.

Custom Wood's accounts receivable and payable were created on the Debtor's books by the Debtor's outside accounting agency. These receivables and payables were adjusted at the end of each fiscal year to reflect the "book" amount owed by Custom Wood to the Debtor. According to the Debtor's records, Custom Wood borrowed substantially from the Debtor. The Trustee alleges that, by the petition date, the net receivable from Custom Wood to the Debtor was at least $938,752.

D. The Farm Affiliates

Betty and Tony are also general partners and equity owners of each of three North Carolina general partnerships: B&D Farms, St. Martin Farms, and Southeastern Farms (the "Farm Affiliates"). The activities of the Farm Affiliates and their relationship with the Debtor's timber business is unclear. The Debtor's financial statements reveal that the Farm Affiliates, like Custom Wood, borrowed substantial sums from the Debtor. The Debtor's internally prepared monthly financial statements disclose $1,019,565 owed by Farm Affiliates to the Debtor as of December 31, 2009. The Trustee alleges that this debt arose substantially, if not entirely, out of previous transfers by the Debtor of cash and/or other property of the Debtor to the Farm Affiliates, and that all of these transfers were without consideration. After having examined the prepetition books and records of

5

the Debtor, the Trustee has found no record of any portion of any Farm Affiliate receivables having been repaid to the Debtor since January 31, 2008. The Trustee alleges that at least $1,019,565 remains due and owing.

E. Stanly Timber Products

More than 20 years before the Debtor filed bankruptcy, Betty's father, Silas Dennis, formed Stanly Timber Products, a North Carolina general partnership. At all times pertinent to this action, Stanly Timber was owned in whole or in part by Betty and Tony, as general partners, each of whom own at least a 20 percent partnership interest in the company. The Trustee alleges that Stanly Timber is an insider of the Debtor under Sections 101(31)(E), 101(2) and 101(9) of the Bankruptcy Code because it is an affiliate of the Debtor.

Stanly Timber is one of the Debtor's twenty largest creditors. Although Stanly Timber is owed $79,891, it did not file a proof of claim. The Trustee alleges that Stanly Timber's creditors were sometimes paid from the Debtor's funds. Specifically, the Trustee alleges that during the three years immediately preceding the Petition Date, the Debtor's practice of paying Stanly Timber's invoices included payments totaling $300,000 to a single, unnamed creditor. These payments were facilitated by Betty, who either signed the checks or approved the payments in her capacity as the Debtor's Secretary. From December 30, 2008 to December 29, 2009, the Debtor transferred $210,055 to Stanly Timber by check. The Defendants did not include these transfers in the Debtor's Statement of Financial Affairs. From December 30, 2005 to December 29, 2008, the Debtor transferred $1,756,043 to Stanly Timber. Although the Debtor may have been supplied with some amount of product by Stanly Timber to support a portion of these payments, there is no information in the Debtor's records to indicate the purpose of the transfers.

6

F. Transactions with First Bank

On December 1, 1997, Tony executed a promissory note on behalf of the Debtor, in favor of First Bank, in the original principal amount of $1,600,000 (the "December 1997 Note"). Under the terms of the December 1997 Note, repayment was amortized over a 10-year term. The December 1997 Note states that it is secured by a deed of trust, a security agreement, and an assignment of a life insurance policy. No additional advances were contemplated by the December 1997 Note.

Also on December 1, 1997, Tony, together with Kay, Betty, and Charles, jointly executed, as tenants in common, a deed of trust on property that they owned in Stanly County, naming Tony as beneficiary (the "December 1997 Deed of Trust"). The December 1997 Deed of Trust was recorded at Book 649, Page 113 of the Stanly County Registry. Tony guaranteed the December 1997 Note. On July 21, 2008, Tony, while acting in his capacity as President of the Debtor and with the assistance of First Bank, caused the Debtor to modify the December 1997 Note, which then had a balance of $1,126,716, to provide that the Debtor would make interest-only payments for six months. Tony made another modification on February 25, 2009. Under the terms of the second modification, interest only payments could be made to First Bank for an additional six months.

On September 23, 2009, twenty-two months after the December 1997 Note had matured, Tony, acting in his capacity as President, executed a new promissory note on behalf of the Debtor, in favor of First Bank, in the principal balance of $1,116,375 (the "September 2009 Note"). Tony and First Bank agreed the September 2009 Note would be secured by the December 1997 Deed of Trust. The Debtor did not receive any new advances under the September 2009 Note, which by its terms, gave the Debtor 90 days to repay the entire principal balance plus interest. Ninety-eight days later, Tony, acting in his capacity as the Debtor's president, filed the Debtor's bankruptcy.

7

G. Claims at Issue

The Trustee alleges that Defendants were the initial transferees of transfers avoidable under Section 544(b) of the Bankruptcy Code and North Carolina law,[1] and under Section 548 of the Bankruptcy Code. The Trustee further alleges that Betty and Tony received preferential payments under Section 547(b), and that Betty, Tony, and DLI were unjustly enriched by these transfers from the Debtor. The Trustee asserts the following nine claims against Betty and Tony: (1) fraudulent conveyances to the Farm Affiliates pursuant to Section 544(b) and N.C. Gen. Stat. § 39-23.4; (2) fraudulent conveyances to the Farm Affiliates pursuant to Section 548; (3) preferences to the Farm Affiliates pursuant to Section 547(b); (4) preferences to Stanly Timber pursuant to Section 547(b); (5) recovery of property of estate pursuant to Section 541 and North Carolina law; (6) recovery of property of estate from the Farm Affiliates pursuant to Section 541 and North Carolina law; (7) breach of fiduciary duty; (8) equitable subordination of their claims pursuant to Section 510(c); and (9) disallowance of their proofs of claim. Six additional claims are asserted against Tony alone: (1) fraudulent conveyances to Custom Wood pursuant to Section § 544(b) and N.C. Gen. Stat. § 39-23.4; (2) fraudulent conveyances to Custom Wood pursuant to Section § 548; (3) preferences to Custom Wood pursuant to Section § 547(b); (4) unfair trade practice pursuant to N.C. Gen. Stat. § 75-1.1; (5) Tony is the alter ego of Custom Wood; and (6) the demand for an accounting by Tony.

## II. DISCUSSION

## A.    The Authority of the Bankruptcy Court to Enter Final Judgments

In a previous opinion, the Court addressed the historical basis for the jurisdiction of bankruptcy courts in this country and included a discussion of the Bankruptcy Act of 1898, the

---

[1]N.C. GEN. STAT. § 39-23.4.

Bankruptcy Reform Act of 1978, the Supreme Court's decision in N. Pipeline Const. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 73 (1982), and the Bankruptcy Amendments and Federal Judgeship Act of 1984 (the "BAFJA").  See In re Freeway Foods, – B.R. –, 2012 WL 112192 (Bankr. M.D.N.C. Jan. 13, 2012).  That discussion will not be repeated here.

### 1. The Current Bankruptcy Jurisdictional Scheme

In response to Marathon, the BAFJA created the current bankruptcy jurisdictional scheme. Under the BAFJA, district courts have original and exclusive jurisdiction over all cases under Title 11.  28 U.S.C. § 1334(a).  District courts also have original but not exclusive jurisdiction over all civil proceedings arising under, arising in, or related to cases under Title 11. 28 U.S.C. § 1334(b). District courts are authorized to refer all cases and proceedings under Title 11 to the bankruptcy courts.  28 U.S.C. § 157(a).  Pursuant to Local Rule 83.11, the United States District Court for the Middle District of North Carolina automatically refers all bankruptcy cases and proceedings to the bankruptcy judges of this district.  The District Court may, however, withdraw such reference at any time pursuant to 28 U.S.C. § 157(d).  Thus, while the referral of a bankruptcy case or proceeding in this district is automatic, it is also revocable.

Under the BAFJA, a bankruptcy judge's authority to enter a final order hinges on whether the bankruptcy proceeding is "core" or "non-core."  28 U.S.C. § 157; Valley Historic Ltd. P'ship v. Bank of N.Y., 486 F.3d 831, 839 n.3 (4th Cir. 2007); In re Morabito, 64 F.3d 658, at *2 (4th Cir. 1995); In re Freeway Foods of Greensboro, Inc., 449 B.R. 860, 872 (Bankr. M.D.N.C. 2011). However, the core/non-core dichotomy does not determine the bankruptcy court's jurisdiction.[2]

---

[2]"Whether a proceeding is core or non-core is beside the point for determining jurisdiction because '[t]hat allocation [of core and non-core] does not implicate questions of subject matter jurisdiction.' Stern, 131 S. Ct. at 2607.  So long as a proceeding is one or the other, the Bankruptcy Court possessed subject-matter jurisdiction." Freeway Foods, 2012 WL

Section 157(b)(1)[3] gives bankruptcy judges the authority to enter final orders in core proceedings.[4]

Section 157(b)(2) contains a non-exhaustive list of sixteen core proceedings. For non-core

proceedings that otherwise relate to the bankruptcy case[5] under Title 11, "the bankruptcy judge shall

submit proposed findings of fact and conclusions of law to the district court." 28 U.S.C. § 157(c)(1).

If the proceeding in question is not "related to" the bankruptcy, then the bankruptcy court has no

---

112192, n.15 (quoting Ace Am. Ins. Co. v. DPH Holdings Corp. (In re DPH Holdings Corp.), No. 10-4170-bk, slip op. (2nd Cir. Nov. 29, 2011)).

[3]A bankruptcy court has the authority to "hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title." 28 U.S.C. § 157(b)(1).

[4]Core proceedings are those that either arise under Title 11 or arise in a bankruptcy case. In re Nichols & Assocs. Tryon Props., Inc., 36 F.3d 1093, at *3 (4th Cir. 1994); Wood v. Wood (In re Matter of Wood), 825 F.2d 90, 96 (5th Cir. 1987). Cases "arise under" Title 11 when the cause of action or substantive right claimed is created by the Bankruptcy Code. Johnson v. Residential Funding Co., LLC, 2011 WL 532024, at *1 n.2 (D. Md. Feb. 8, 2011); In re 3G Props., LLC, 2010 WL 4027770, at *2 (Bankr. E.D.N.C. Oct. 14, 2010); In re Langford, 2007 WL 3376664, at *3 (Bankr. M.D.N.C. Nov. 2, 2007). Cases "arise in" a title 11 proceeding if they "are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy." In re A.H. Robins Co., Inc., 86 F.3d 364, 371 (4th Cir. 1996) (quoting Wood, 825 F.2d at 97); 3G Props., 2010 WL 4027770, at *2. "[C]ore proceedings should be given a broad interpretation that is close to or congruent with constitutional limits." In re Fairfield Sentry Ltd., et al. Litig., 458 B.R. 665, 675 (S.D.N.Y. Sept. 19, 2011); see In re Johnson, 960 F.2d 396, 401 (4th Cir.1992) ("Many courts construe the term 'core proceedings' quite broadly. Indeed, the ambiguity in § 157(b)(2) invites such interpretation with such broadly inclusive language that encompasses proceedings 'affecting the liquidation of assets of the estate' and matters 'concerning the administration of the estate.'"); In re Arnold Print Works, Inc., 815 F.2d 165, 168 (1st Cir.1987); In re Mankin, 823 F.2d 1296, 1301 (9th Cir. 1987).

[5]A civil proceeding is "related to" a Title 11 case if the action's outcome might have any conceivable effect on the bankrupt estate. Valley Historic Ltd. P'ship, 486 F.3d at 836; New Horizon of N.Y. LLC v. Jacobs, 231 F.3d 143, 155 (4th Cir. 2000); Freeway Foods, 449 B.R. at 873.

jurisdiction to hear the matter at all.[6]  Thus, the BAFJA draws a core/non-core line to delineate between those proceedings in which a bankruptcy court can enter final orders and those in which it cannot.[7]  Until <u>Stern</u>, courts had very little reason to question the constitutionality of the BAFJA.[8]  After <u>Stern</u>, the issue has been considered by many courts.

### 2. Stern v. Marshall

On June 23, 2011, the Supreme Court decided <u>Stern v. Marshall,</u> 564 U.S. –, 131 S. Ct. 2594 (2011).  Since then, many courts have struggled to understand <u>Stern</u>'s reasoning and apply its

---

[6]<u>See</u> 28 U.S.C. § 1334(b); <u>Arbaugh v. Y & H Corp.</u>, 546 U.S. 500, 514 (2006) (a court which lacks subject matter jurisdiction cannot hear the matter at all and must dismiss it); <u>Celotex Corp. v. Edwards</u>, 514 U.S. 300, 308 n.6 (1995) ("[B]ankruptcy courts have no jurisdiction over proceedings that have no effect on the estate of the debtor.").

[7]"Although <u>Marathon</u> and BAFJA contemplated no change whatsoever in the sum total of federal bankruptcy jurisdiction, they have nonetheless converted the statute's three jurisdictional nexuses into terms of art that draw a divide in this federal bankruptcy jurisdiction between (1) "core" proceedings "arising under" or "arising in," in which a bankruptcy judge can enter final orders, and (2) noncore "related to" proceedings, in which only a district court can enter final orders absent consent of the parties to a bankruptcy court adjudication." Ralph Brubaker, <u>Article III's Bleak House (Part I): The Statutory Limits of Bankr. Judges' Core Jurisdiction</u>, 31 No. 8 BANKR. L. LETTER 1, 16 (Aug., 2011) [hereinafter "Brubaker, <u>Part I</u>"] (quoting Ralph Brubaker, <u>On the Nature of Fed. Bankr. Jurisdiction: A Gen. Statutory & Constitutional Theory</u>, 41 WM. & MARY L. REV. 743, 857 (2000) (footnotes omitted)).

[8]<u>See</u> <u>In re Apex Express Corp.</u>, 190 F.3d 624, 631 (4th Cir. 1999) (applying and interpreting BAFJA's core/non-core distinction); <u>Wood</u>, 825 F.2d at 95-98 (interpreting and applying the jurisdictional provisions of BAFJA); <u>In re Ben Cooper, Inc.</u>, 896 F.2d 1394 (2d Cir. 1990) (assuming the constitutionality of the BAFJA without analysis); <u>see also</u> <u>Meoli v. Huntington Nat'l Bank (In re Teleservs. Grp., Inc.)</u>, 456 B.R. 318, 320 (Bankr. W.D. Mich. 2011) ("For over twenty-five years, my colleagues and I have operated with the understanding that we were properly constituted judges capable of rendering final judgments in many, but not all, matters arising in connection with a bankruptcy proceeding.").

holding.[9]  The facts of Stern have been discussed at length[10] and will not be repeated here.  In Stern, the Supreme Court determined that 28 U.S.C. § 157(b)(2)(C) authorized bankruptcy courts to enter final judgments on counterclaims that were asserted against proofs of claim filed by creditors.  Stern, 131 S. Ct. at 2608.  The Court found, however, that the counterclaim in question—a state law claim for tortious interference with an expected gift—existed without regard to any bankruptcy proceeding, and a final judgment could not be entered by a non-Article III court.[11]  Id. at 2618.  Therefore, 28 U.S.C. § 157 was unconstitutional in its application to the counterclaim in question.  Id. at 2620.

The Stern court emphasized a point made in Marathon: as Article I courts, bankruptcy courts may not enter final judgments in non-bankruptcy matters that are based on the common law or state law.  Stern, 131 S. Ct. at 2609.  Consistent with separation of powers principles, the majority impressed that "Congress may not 'withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty.'"  Id. (citing Murray's

---

[9]See, e.g., Teleservs. Grp., 456 B.R. at 323 ("[Stern] offers virtually no insight as to how to recalibrate the core/non-core dichotomy. . . .").

[10]For an extensive discussion of the facts and procedural posture of Stern, see In re USDigital, Inc., – B.R. –, 2011 WL 6382551, at *2-3 (Bankr. D. Del. Dec. 20, 2011); In re Safety Harbor Resort & Spa, 456 B.R. 703, 707-10 (Bankr. M.D. Fla. 2011); Brubaker, Part I, at 2-6.

[11]"Stern distinguished prior cases that considered trustees' counterclaims against proofs of claim by noting that whereas those counterclaims 'assert[ed] a right of recovery created by federal bankruptcy law,' the tortious interference claim was 'in no way derived from or dependent upon bankruptcy law.'"  SIEGEL v. FDIC (In re Indymac Bancorp Inc.), 2011 WL 2883012, at *6 (C.D. Cal. July 15, 2011) (quoting Stern, 132 S. Ct. at 2618).  See Fairfield Sentry, 458 B.R. at 688 (citing Stern, 131 S.Ct at 2611) ("Pre-petition common law actions for a claim requiring adjudication of factual disputes unrelated to bankruptcy are not core claims. These claims are private rights because they are 'state law action[s] independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy.'").

Lessee v. Hoboken Land & Improvement Co., 59 U.S. (18 How.) 272, 284, 15 L.Ed. 372 (1856);

Marathon, 458 U.S. at 70 n.25 ("What clearly remains subject to Art. III are all private adjudications

in federal courts within the States—matters from their nature subject to 'a suit at common law or

in equity or admiralty' . . . ").  Article III protects a constellation of judicial power, specifically "the

stuff of the traditional actions at common law tried by the courts at Westminster in 1789," from

encroachment by the other branches.  Id. at 2609 (quoting Marathon, 458 U.S. at 90 (Rehnquist, J.,

concurring)).  Bankruptcy courts, as non-Article III tribunals, therefore lack constitutional authority

to finally adjudicate state-created private rights.  Id. at 2620; see also Marathon, 458 U.S. at 71 ("the

restructuring of debtor-creditor relations . . . must be distinguished from the adjudication of

state-created private rights, such as the right to recover contract damages that is at issue in this

case.").[12]

    From this analysis, Stern provides a two-prong test:

> We see no reason to treat Vickie's counterclaim any differently from the fraudulent
> conveyance action in Granfinanciera. 492 U.S., at 56, 109 S. Ct. 2782.
> Granfinanciera's distinction between actions that seek "to augment the bankruptcy
> estate" and those that seek "a pro rata share of the bankruptcy res," ibid., reaffirms
> that Congress may not bypass Article III simply because a proceeding may have
> some bearing on a bankruptcy case; the question is whether the action at issue stems
> from the bankruptcy itself or would necessarily be resolved in the claims allowance

---

[12]In 1989, the Supreme Court decided Granfinanciera, S.A. v. Nordberg, 492 U.S. 33 (1989), holding "that common-law actions to augment the size of the estate involving disputed facts to be determined by a jury are not core, as opposed to actions to divvy up and order claims against the estate, which are [core]."  Fairfield Sentry, 458 B.R. at 688 (citing Granfinanciera, 492 U.S. at 56). This distinction recalls the summary/plenary dichotomy under the Bankruptcy Act of 1898, which itself harkens back to the differences between courts of law and equity in the English judicial system. The majority opinion in Stern relied on the distinction drawn in Granfinanciera between actions "to augment the bankruptcy estate" and actions to determine a creditor's right to receive "a pro rata share in the bankruptcy res," ultimately concluding that bankruptcy courts have the constitutional authority to enter final judgments in the latter, but not the former, causes of action. See Kenneth Klee, On the Supreme Court's Holding in Stern v. Marshall, 2011 U.S. LEXIS 4791, at *4 (2011).

process."

Stern, 131 S. Ct. at 2618.  If either prong of the test is met, then the bankruptcy court has constitutional authority to enter a final order.  Conversely, if the action neither stems from the bankruptcy itself nor would necessarily be resolved in the claims allowance process, the bankruptcy court lacks constitutional authority to enter final judgment and may only submit proposed findings of fact and conclusions of law to the district court.[13]

**B.    The Trustee's Causes of Action Against Tony, Betty, and Chris**

Tony, Betty, and Chris filed proofs of claim against the Debtor.[14]  The Court will consider the claims in the three adversary proceedings (Nos. 11-6033, 11-6034, and 11-6036) that the Trustee has filed against them and determine, pursuant to Stern, whether it can enter a final judgment regarding each cause of action that the Trustee asserts.

### 1. Fraudulent Conveyance Claims Pursuant to Section 544(b) of the Bankruptcy Code and N.C. Gen. Stat. § 39-23.4 and Pursuant to Section 548 of the Bankruptcy Code

The Trustee asserts several claims against Tony, Betty, and Chris based on Section 544(b)

---

[13]As many courts have noted, the Supreme Court emphasized in Stern that 28 U.S.C. § 157 is not a jurisdictional statute: "Section 157 allocates the authority to enter final judgment between the bankruptcy court and the district court. That allocation does not implicate questions of subject matter jurisdiction."  Stern, 131 S. Ct. at 2607.

[14]On October 28, 2010, Betty Lambert filed Claim No. 105, which alleges an unsecured debt to her of $1,049,367.02. On December 22, 2010, Chris Lambert filed Claim No. 118, which alleges an unsecured debt to him of $23,871.48. On December 23, 2010, Tony Dennis filed Claim No. 129, which alleges an unsecured debt to him of $348,467.65. For all three claims, the stated basis is "monies loaned."

and N.C. Gen. Stat. § 39-23.4,[15] or based on Section 548.[16]  The Trustee alleges that collectively they received various transfers from the Debtor totaling over $2,000,000.00.  With regard to each fraudulent conveyance count, Tony, Betty, and Chris make four arguments.  First, they argue that the adjudication of these fraudulent conveyance claims have nothing to do with the allowance of their proofs of claim.  Second, they argue that the Trustee's claims are based on state fraudulent conveyance law, so they do not stem from the Debtor's bankruptcy.  Third, they assert that the adjudication of their claims does not fall under the public rights exception.  Fourth, they argue that they have a right to a trial by jury.  Tony, Betty, and Chris maintain that the Court may only submit proposed findings of fact and conclusions of law pursuant to 28 U.S.C. § 157(c)(1).

Because Tony, Betty, and Chris have filed proofs of claim, the Court has the authority to enter a final judgment.  In Commodity Futures Trading Commission v. Schor, 478 U.S. 833 (1986), the Supreme Court reaffirmed that litigants can waive the right to an adjudication by an Article III court.

> Moreover, as a personal right, Article III's guarantee of an impartial and independent federal adjudication is subject to waiver, just as are other personal constitutional rights that dictate the procedures by which civil and criminal matters must be tried. Indeed, the relevance of concepts of waiver to Article III challenges is demonstrated by our decision in Northern Pipeline, in which the absence of consent to an initial adjudication before a non-Article III tribunal was relied on as a significant factor in determining that Article III forbade such adjudication.

Id. at 848–49 (citations omitted).  Similarly, in Granfinanciera, the Court suggested that if the defendant had submitted a claim against the estate, the result would be different.  The Court

---

[15]North Carolina has codified the Uniform Fraudulent Transfer Act. See N.C. GEN. STAT. § 39-23 et seq.

[16]These include counts 1, 2 4, 5, 7, and 8 against Tony Dennis; counts 1, 2, 4, and 5 against Betty Lambert; and counts 1 and 2 against Chris Lambert.

reasoned that <u>Schoental v. Irving Trust Co.</u>, 287 U.S. 92 (1932), and <u>Katchen v. Landy</u>, 382 U.S. 323 (1966), held that "under the Seventh Amendment, a creditor's right to a jury trial on a bankruptcy trustee's preference claim depends upon whether the creditor has submitted a claim against the estate." <u>Granfinanciera</u>, 492 U.S. at 58. Because the defendants to the fraudulent transfer actions in <u>Granfinanciera</u> had not filed claims against the estate, "the fraudulent conveyance action [did] not arise 'as part of the process of allowance and disallowance of claims.'" <u>Id</u>. Therefore, Congress could not "divest [the defendants] of their Seventh Amendment right to a trial by jury." <u>Id.</u> at 58-59. Thus, even before <u>Stern</u>, it was well settled that a bankruptcy court could enter final orders in avoidance actions against a party who filed a proof of claim. It has long been questionable whether some avoidance actions fall within the bankruptcy court's core jurisdiction,[17] but there has been no dispute that a bankruptcy court must disallow "any claim of any entity from which property

---

[17]<u>See</u> <u>In re Davis</u>, 899 F.2d 1136, n.9 (11th Cir.1990), <u>cert. denied sub nom</u> <u>Gower v. Farmers Home Admin.</u>, 498 U.S. 981 (1990) (The "assumption [that Article III is not violated by the resolution of 'core' bankruptcy proceedings by non-Article III bankruptcy courts] is open to serious question. While Supreme Court dicta in two cases following <u>Northern Pipeline</u> seemed to take a narrow view of that decision, the Court's more recent decision in <u>Granfinanciera</u> appeared to adopt the analysis of the <u>Northern Pipeline</u> plurality, and cast doubt on the constitutionality of the bankruptcy courts' authority, under § 157(b), to adjudicate certain "core" proceedings without the parties' consent. . . . The [<u>Granfinanciera</u>] Court . . . strongly suggested—although it specifically avoided holding—that fraudulent-conveyance and voidable-preference actions under 11 U.S.C.A. §§ 547–548 are 'private-right' claims which 'must be tried under the auspices of an Article III court.'") (citations omitted); Elizabeth Gibson, <u>Jury Trials and Core Proceedings: The Bankruptcy Judge's Uncertain Authority</u>, 65 AM. BANKR. L.J. 143, 168 (Winter 1991) ("Because, then, a fraudulent conveyance action involves only private rights—at least when the defendant has not filed a claim against the estate—according to <u>Granfinanciera</u> Congress may not assign its adjudication to the non-article III bankruptcy court. Such assignment would be prohibited whether or not the parties demanded a jury trial, because in either event the action would involve private rights, thus necessitating adjudication by an article III court.") (footnotes omitted).

is recoverable" because of a preferential transfer or fraudulent conveyance.  11 U.S.C. § 502(d).[18]

Such actions are core proceedings in which a bankruptcy court may enter a final order.  See

Langenkamp v. Culp, 498 U.S. 42, 44 (1990) ("[B]y filing a claim against the bankruptcy estate the

creditor triggers the process of 'allowance and disallowance of claims' . . . If the creditor is met, in

turn, with a preference action from the trustee, that action becomes part of the claims-allowance

process. . . .  In other words, the creditor's claim and the ensuing preference action by the trustee

become integral to the restructuring of the debtor-creditor relationship.") (internal quotation

omitted); In re Parker North Am. Corp., 24 F.3d 1145, 1149 (9th Cir. 1994) (quoting Langenkamp,

24 F.3d at 44); Glinka v. Abraham and Rose Co., Ltd., 1994 WL 905714 at *11 (D. Vt. June 6,

1994) ("Because 11 U.S.C. § 502(d) provides that the claims of pre-petition fraudulent transfers may

be disallowed, it is clear that the count brought pursuant to 11 U.S.C. § 548 is part of the claims

allowance process, must be determined as a necessary part of determining the validity of Federal

Plastics' claim, and does not carry a jury trial right.").

    After Stern, without the consent of the litigants, a bankruptcy court can hear a fraudulent

conveyance action but may only submit proposed findings and conclusions to the district court.

Ralph Brubaker, Article III's Bleak House (Part II): The Statutory Limits of Bankruptcy Judges'

Core Jurisdiction, 31 No. 9 BANKR. L. LETTER 1, 37 (Sept., 2011) [hereinafter "Brubaker, Part II"].

However, even without consent, a bankruptcy court can enter a final judgment in a fraudulent

---

[18]"Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522 (f), 522 (h), 544, 545, 547, 548, 549, or 724 (a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522 (i), 542, 543, 550, or 553 of this title."  11 U.S.C. § 502(d).

transfer action under either Section 548 or Section 544 so long as the defendant has also filed a claim against the estate, making the fraudulent transfer action part of the process of allowance and disallowance of claims.  See In re First Ams. Ins. Serv., Inc., 2012 WL 171583, at *3 (Bankr. D. Neb. Jan. 20, 2012) ("Here, the defendant has filed a proof of claim in the First Americans case and has therefore brought himself within the court's jurisdiction, because the resolution of the trustee's [fraudulent conveyance] causes of action are a necessary part of the claims resolution process."); In re Coated Sales, Inc., 119 B.R. 452, 455 (Bankr. S.D.N.Y. 1990) ("As Granfinanciera makes clear, by submitting a claim against the bankruptcy estate, creditors subject themselves to the court's equitable power to disallow those claims. Concomitantly, when the claimant invokes the equitable jurisdiction of the bankruptcy court to establish its right to participate in distribution, it cannot, thereafter, object to the court's necessary determination of any misappropriations by the claimant.") (citations omitted).

The Court need not address the other arguments of the defendants. Because Tony, Betty, and Chris have filed proofs of claim against the estate, the resolution of the Section 544(b) and Section 548 fraudulent transfer claims against them are core proceedings, and the Court may enter final orders.

## 2. Preferences Claims Pursuant to Section 547(b) of the Bankruptcy Code

The Trustee asserts several claims against Tony, Betty, and Chris based on Section 547 of the Bankruptcy Code.[19]  The Trustee alleges that collectively they received various preferential transfers from the Debtor totaling over $470,000.00.  The Trustee argues that because Tony, Betty, and Chris have filed proofs of claim, the Court has the authority to enter a final judgment.  The

---

[19]These include counts 3, 6, 9, and 10 against Tony Dennis; counts 3, 6, and 7 against Betty Lambert; and count 3 against Chris Lambert.

defendants make the same four arguments that they made with regard to the Trustee's fraudulent conveyance claims.

The fraudulent conveyance analysis in the previous section applies equally to preferences. Beginning with Katchen v. Landy and continuing with Langenkamp v. Culp, the Supreme Court has pronounced that the resolution of a preference claim brought by the trustee against a creditor who has filed a proof of claim is an integral part of the general claims resolution process under Section 502(d) of the Bankruptcy Code. Langenkamp, 498 U.S. at 44-45; Katchen, 382 U.S. at 476. Section 502(d) "preclude[s] entities which have received voidable transfers from sharing in the distribution of the assets of the estate unless and until the voidable transfer has been returned to the estate." In re Mid Atlantic Fund, Inc., 60 B.R. 604, 609 (Bankr. S.D.N.Y. 1986). Thus, before a claim may be allowed, a court must resolve any preference or fraudulent transfer issues that the trustee might raise. In both Katchen and Langenkamp, the Supreme Court relied on Section 502(d) to conclude that a creditor-defendant who files a proof of claim has no Seventh Amendment right to a jury trial in a subsequent preference action brought by the trustee. If a creditor who files a proof of claim "is met, in turn, with a preference action . . . that action becomes part of the claims-allowance process which is triable only in equity." Langenkamp, 498 U.S. at 44.

In Granfianciera, the Court treated preference actions as "indistinguishable from [a fraudulent conveyance] suit in all relevant respects." Granfinanciera, 492 U.S. at 48 (relying on Schoenthal, 287 U.S. at 95 , which held that a preference action against a creditor who did not file a claim against the estate had to proceed as an action at law rather than in equity). See Brubaker, Part II, at *36; MICHAEL ST. PATRICK BAXTER, S. ELIZABETH GIBSON, RANDAL C. PICKER AND R. PATRICK VANCE, NATIONAL BANKRUPTCY CONFERENCE COMMITTEE ON COURTS AND THE

ADMINISTRATIVE SYSTEM, THE SCOPE AND LIMITATIONS OF STERN V. MARSHALL, 131 S. CT. 2594 (2011) (Oct. 26, 2011) ("The Court throughout its <u>Granfinanciera</u> opinion equated fraudulent conveyance actions with preference actions.").

In <u>Stern</u>, the Court found that under <u>Langenkamp v. Culp</u> "a preferential transfer claim can be heard in bankruptcy when the allegedly favored creditor has filed a claim, because then 'the ensuing preference action by the trustee become[s] integral to the restructuring of the debtor-creditor relationship.'" 131 S. Ct. at 2617 (quoting <u>Langenkamp</u>, 498 U.S. at 44). "If, in contrast, the creditor has not filed a proof of claim, the trustee's preference action does not 'become[ ] part of the claims-allowance process' subject to resolution by the bankruptcy court." <u>Id.</u> <u>Stern</u> described <u>Katchen</u> as holding that a bankruptcy referee had "summary jurisdiction" over a preference claim "because it was not possible for the referee to rule on the creditor's proof of claim without first resolving the voidable preference issue." 131 S. Ct. at 2616. One of the consequences of filing a claim against the estate "was resolution of the preference issue as part of the process of allowing or disallowing claims, and accordingly there was no basis for the creditor to insist that the issue be resolved in an Article III court." <u>Id.</u>

The conclusion is inescapable: if a defendant in a preference action has filed a proof of claim, then the matter is a core proceeding, and the bankruptcy court may enter a final order.[20] Because Tony, Betty, and Chris have filed proofs of claim against the estate, the resolution of the Section 547 preference claims against them are core proceedings, and the Court may enter final orders.

---

[20]"[T]he only durable justification for non-Article III adjudication of the preference actions in <u>Katchen</u> and <u>Langenkamp</u> . . . is the Court's "necessity" rationale: as objections and counterclaims to creditors' claims against the estate, adjudication of the preferences was necessarily part and parcel of the summary process of adjudicating allowance of the creditors' claims against the estate." Brubaker, <u>Part II</u>, at *38.

### 3. Recovery of Estate Property Pursuant to Sections 541 and 542 of the Bankruptcy Code and North Carolina Law

The Trustee alleges that the Debtor made various loans to Tony and Betty and that the outstanding balance of such loans totals $764,235.00, for which each is liable for "some portion."[21] The Trustee asserts that this debt is property of the Debtor's estate pursuant to Section 541 of the Bankruptcy Code. As to Tony and Betty, the Trustee seeks to collect "that portion of the 'Officers and Others' receivables in the amount of $764,235.00 that is attributable to [them] personally."

There can be no dispute that this Court has the authority to determine what is and is not property of the Debtor's bankruptcy estate and enter final orders regarding the same.[22] However, these claims seek more than a declaratory judgment about property of these estate. They seek an order requiring Tony and Betty to turn over to the Trustee payment for some portion of a pre-petition account receivable owed to the estate. Orders to turn over property of the estate are core proceedings under the plain language of 28 U.S.C. § 157(b)(2)(E). Yet, any exercise in interpreting the scope of the fifteen enumerated core matters in Section 157(b)(2) must be done within the guidelines set forth by the Supreme Court, given that the purpose of the Section was to rectify the

---

[21]The allegations are contained in count 11 against Tony and count 8 against Betty.

[22]See In re BankUnited Fin. Corp., 462 B.R. 885, at 893-94 (Bankr. S.D. Fla. 2011) ("Contrary to the FDIC–R's argument, what is or is not property of a bankruptcy estate is an issue that stems from the bankruptcy itself (Stern), one that can only arise in a bankruptcy proceeding (Wood), since the concept of what is property of a bankruptcy estate does not exist outside of a bankruptcy case. Moreover, the fact that the determination of whether the Tax Refunds are property of the estate is determined under non-bankruptcy law and is an issue that could be resolved in a non-bankruptcy forum is irrelevant since the issue of what is property of the estate is virtually always a matter of state law or other non-bankruptcy law. Butner v. U.S., 440 U.S. 48 (1979)."); In re Washington Mutual, Inc., 461 B.R. 200, 217 (Bankr. D. Del. 2011) ("It is without question that bankruptcy courts have exclusive jurisdiction over property of the estate. . . . That jurisdiction includes jurisdiction to decide whether disputed property is, in fact, property of the estate.").

unconstitutional jurisdiction found in Marathon.  See Apex Express, 190 F.3d at 631-32 ("[A] broad reading of the literal terms of the statutory text could lead to the result that courts treat just about every dispute as "core.". . . [T]he statute must be interpreted keeping in mind . . . that Congress passed it in response to the defects revealed by Northern Pipeline."); In re Ill.-Calif. Exp., Inc., 50 B.R. 232, 237 (Bankr. Colo. 1985).

Before Stern, some courts held that actions seeking turnover of pre-petition accounts receivable were core proceedings pursuant to various subsections of 28 U.S.C. § 157(b)(2),[23] but a majority of courts held that such actions were non-core proceedings.[24] The basis for the majority's conclusion was that so-called turnover actions were in fact collection actions, and therefore constitutionally indistinguishable from the breach of contract action at the heart of Marathon.[25]

---

[23]See, e.g., In re Nat'l Equip. & Mold Corp., 60 B.R. 133, 135-36 (Bankr. N.D. Ohio 1986) (action to collect an account receivable is a turnover action pursuant to § 157(b)(2)(E)); In re Franklin Computer Corp., 50 B.R. 620, 626 (Bankr. E.D. Pa. 1985) (action to collect an account receivable could be a matter concerning the administration of the estate pursuant to § 157(b)(2)(A), a turnover action pursuant to § 157(b)(2)(E), or a proceeding affecting the liquidation of the assets of the estate pursuant to § 157(b)(2)(O)); In the Matter of Baldwin-United Corp., 48 B.R. 49, 53 (Bankr. S.D. Ohio 1985) (action to collect an account receivable could be a turnover action pursuant to § 157(b)(2)(E) or a proceeding affecting the liquidation of the assets of the estate pursuant to § 157(b)(2)(O)).

[24]See, e.g., In re Nell, 71 B.R. 305, 308-09 (D. Utah 1987); Windsor Commc'ns Grp., Inc. v. Grant (In re Winsdor Commc'ns Grp., Inc.), 75 B.R. 713, 721 (E.D. Pa. 1985); In re Astrocade, Inc., 79 B.R. 983, 989 (Bankr. D. Ohio 1987); In re Northeast Dairy Co-op. Fed'n, Inc., 72 B.R. 663, 676 (Bankr. N.D.N.Y. 1987); In re Satelco, Inc., 58 B.R. 781, 786 (Bankr. N.D. Tex. 1986); Englander Co. v. City Mattress of Amherst, Inc., 52 B.R. 875, 878 (Bankr. C.D. Cal. 1985); In re B & L Oil Co., 46 B.R. 731, 735 (Bankr. D. Colo. 1985); Smith Douglass, Inc. v. Smith, 43 B.R. 616, 618 (Bankr. E.D.N.C. 1984).

[25]See, e.g., St. George Island, Ltd. v. Pelham, 104 B.R. 429, 430-31 (Bankr. N.D. Fla. 1989) ("Clearly, under Marathon, the suit before this court concerns a matter of prepetition private rights not closely intertwined with a congressionally created regulatory scheme. While this proceeding may affect the disposition of the debtor's estate, it did not arise in the core bankruptcy function of adjusting debtor-creditor rights and is, therefore, merely a related matter or a "non-core" issue."); In the Matter of Century Brass Prods., Inc., 58 B.R. 838, 844 (Bankr. D.

Consistent with the majority position, the Fourth Circuit held in <u>Apex Express Corp. v. The Wise Co., Inc.</u>, 190 F.3d 624 (4th Cir. 1999), that "accounts receivable" claims against strangers to the bankruptcy proceeding and "other litigation based on pre-petition contract-based rights," at least when grounded in state law and arising prepetition, must be treated as non-core matters. <u>Id.</u> at 631-32.

The Court approaches the Trustee's claims against Tony and Betty with this history in mind, and nevertheless concludes that the action is core under Section 157(b)(2)(E). The <u>Stern</u> analysis begins with the question of whether the action is a core matter pursuant to 28 U.S.C. § 157(b)(2). <u>Stern</u>, 131 S. Ct. at 2608. Although the cause of action does not cite Section 542, "it bears a strong similarity to a turnover proceeding, which Congress has expressly included in its open-ended definition of core proceedings." <u>In re Pied Piper Casuals, Inc.</u>, 50 B.R. 549, 551 (Bankr. S.D.N.Y.1985). Courts presented with claims styled as turnover actions face the complicated task of navigating the blurry divide between bona fide turnover actions, which are core matters under the plain meaning of the statute, from collection actions under state law, which are non-core under both <u>Marathon</u> and <u>Stern.</u> <u>See In re Dayton Title Agency, Inc.</u>, 264 B.R. 880, 883 (S.D. Ohio 2000) ("[T]he words 'to turnover property of the estate' are terms of art in the bankruptcy context . . . .

_____

Conn. 1986) ("The type of adjudication involved in this proceeding is not in any meaningful way distinguishable from the one involved in <u>Northern Pipeline</u>. I am unpersuaded that the revised bankruptcy court structure resulting from the 1984 Act allows bankruptcy courts to hear and determine, without consent, account receivable actions brought by the estate against a defendant who has not filed a claim."); <u>In re Atlas Automation, Inc.</u>, 42 B.R. 246, 247 (Bankr. E.D. Mich. 1984) ("In light of the fact that [the BAFJA] was enacted in response to the Supreme Court's holding in [<u>Marathon</u>] and that that case involved an action similar in legal nature to the case at hand, i.e., a breach of contract action, it is doubtful that Congress intended this type of case to be tried by a bankruptcy court. Thus, although the perimeters of the definition of "turn over property of the estate" and "proceeding affecting the liquidation of the assets of the estate" are yet to be explored, they do not include actions of this type. Therefore, the Court . . . determines that this case is a "proceeding that is otherwise related to a case under title 11.").

Section 542 deals with debts which are matured, payable on demand, or payable on order. . . . When, instead, an adversary proceeding presents a bona fide dispute as to liability, the matter cannot be viewed as a turnover proceeding under 28 U.S.C. § 157(b)(2).").  The Court starts with the plain language of Section 157(b)(2)(E), which states that orders to turn over property of the estate are core. Section 542(b) requires all entities that owe a debt to the debtor on the petition date, that is both property of the estate and is "matured, payable on demand, or payable on order," to turn over or to pay that debt to the trustee or debtor in possession.  11 U.S.C. § 542.  Such debts "commonly include accounts receivable, liquidated judgments or monies held in trust or in escrow."  5 COLLIER ON BANKRUPTCY ¶ 542.03 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2011); Allegheny, Inc. v. Laniado Wholesale Co., 68 B.R. 183, 193 (Pa. 1986) (accounts receivable are considered to be mature debts).  An examination of the legislative history of Section 542(b) compels a broad view of Section 542's turnover power.  See U.S. v. Whiting Pools, Inc., 674 F.2d 144, 152 (2d Cir.1982) ("[A]n examination of the legislative history antedating 1977 compels a broad view of § 542's turnover power."); In re Sunrise Equip. and Devel. Corp., 24 B.R. 26, 27-28 (Bankr. Ariz. 1982) (examining the legislative history and concluding "We are not aware of any witness opposing a broad turnover power if accompanied by proper provisions for protection").  Since Stern, three courts have considered whether turnover claims are core proceedings pursuant to Section 157(b)(2)(E); in each case, the court found that the action was core.  See In re McCrory, 2011 WL 4005455, at *1 (Bankr. N.D. Ohio Sept. 8, 2011); In re Miller, 2011 WL 3741846, at *1 (Bankr. N.D. Ohio Aug. 24, 2011); Badami v. Sears (In re AFY, Inc.), 2011 WL 3812598, at *1 (Bankr. D. Neb. Aug. 18, 2011).

The Trustee's complaint states a claim for turnover under Section 542(b).[26] Although Tony and Betty deny that they are liable on the accounts, such a denial does not mean that the debt is not mature. A debt may be both mature for purposes of this Section 542(b) and nonetheless disputed by the defendant. See In re Willington Convalescent Home, Inc., 850 F.2d 50, 52 n.2 (2d Cir. 1988). In other words, "for an action to be a turnover proceeding, it is not relevant that the defendant disputes the existence of the debt by, perhaps, denying the complaint's allegations, as long as those allegations state the existence of a mature debt." In re Nat'l Enters, Inc., 128 B.R. at 959. The Trustee's complaint alleges that Betty and Tony owe a matured debt that is property of the estate under Section 541. Moreover, the amount of the claim is liquidated. The Trustee's allegations are based on the Debtor's books, which show that $764,235 is owed. The Court is not presented with an unliquidated claim that requires a determination of the rights of parties under state contract law. The Trustee is merely attempting to collect a matured, liquidated debt that is property of the estate according to the Debtor's records—records that Tony and Betty are responsible for keeping. The Trustee has thus stated a claim for turnover under Section 542(b). The matter is therefore core under Section 157(b)(2)(E).[27] See In re Wilson Feed Co., Inc., 142 B.R. 123, 125 (Bankr. E.D. Va. 1992)

---

[26] "Except as provided in subsection (c) or (d) of this section, an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee . . . ." 11 U.S.C. § 542(b). See In re Nat'l Enters., Inc., 128 B.R. 956, 959 (E.D. Va. 1991) ("Section 542(b) creates an action for turnover of matured debts owed to a bankrupt estate. These may be, for example, debts owed for accounts receivable, for judgments already obtained or for monies previously held in trust or in escrow.) (citations omitted).

[27] Alternatively, the Trustee's claim might also be considered core under Section 157(B)(2)(C). The analysis of In re VP Energy, Inc., 300 B.R. 621, 625 (Bankr. W.D. Pa. 2003), is instructive. In VP Energy, the Chapter 11 debtor filed a complaint to dispute contract claims between itself and various creditors. Id. at 625. The complaint did not seek relief in the nature of "turnover," but the court found that it could nevertheless exercise "core" jurisdiction: the substance of each of the four counts of the complaint arose entirely out of transactions or

25

(debtor seeking collection on an account receivable has an action for turnover of estate property under Section 542(b)).

The Court notes that its conclusion is apparently at odds with the Fourth Circuit's holding in Apex Express. The Apex Express decision, however, is distinguishable from the facts before the court in at least two ways. First, the Apex Express court considered whether an account receivable claim that was based upon a prepetition breach of a prepetition contract was a core proceeding. The court held that such a claim, when grounded in state law and arising prepetition, must be treated as non-core. Apex Express, 190 F.3d at 631. In Apex, the Court specifically considered accounts receivable claims against "strangers to the bankruptcy proceedings and other litigation based on pre-petition contract-based rights." Id. Here, Betty and Tony are not strangers to the

---

occurrences that were the subject of the creditors' proofs of claim, such that each count was, in essence, a counterclaim to creditors' proofs of claim. Id. The court concluded that the counts were counterclaims, notwithstanding that they were asserted in a separate adversary proceeding, and notwithstanding that they sought relief in excess of that which was sought in the proofs of claim. Id. The VP Energy court explained that the counts

> constitute core matters . . . notwithstanding the Court's determination that . . .
> none of the first three of such counts constitute core turnover actions within the
> meaning of 11 U.S.C. § 542(b) and 28 U.S.C. § 157(b)(2)(E). . . . The Court holds
> that the Debtor's four counts nevertheless raise core matters because (a) the
> substance of each of the Debtor's four counts arises entirely out of the transactions
> or occurrences that are the subject matter of the Proofs of Claim, (b) the filing of
> the Proofs of Claim significantly predate the Debtor's filing of its complaint and
> amended complaint, (c) each of the Debtor's four counts consequently constitutes,
> in essence, a counterclaim—indeed, a compulsory counterclaim—to the Proofs of
> Claim, (d) "[c]ore proceedings include . . . counterclaims by the estate against
> persons filing claims against the estate," 28 U.S.C.A. § 157(b)(2)(C) (West 1993),
> and (e) the matters raised within the Debtor's four counts consequently constitute
> core matters pursuant to § 157(b)(2)(C).

Id. In this case, the Trustee's claims against Tony and Betty, like their proofs of claim, arise out of the transactions that occurred between them and the Debtor. Their proofs of claim were filed long before the Trustee's complaint. The Trustee's claims are, in essence, counterclaims against Tony and Betty. They require the turnover of money by Tony and Betty in payment of an account receivable. Thus, the Court concludes that the Trustee's claims may also be core proceedings, pursuant to Section 157(b)(2)(C).

bankruptcy—indeed, both parties are principals of the Debtor and have filed proofs of claim.[28] Second, the court qualified its holdings to accounts receivable claims "grounded in state law," specifically contract law. Id. at 631-32. Here, the Trustee seeks turnover of the receivable listed in the Debtor's books on the ground that these funds are property of the estate within the meaning of 11 U.S.C. § 541. The need to apply state law does not deprive the bankruptcy court of authority to determine whether the accounts are property of the estate and therefore recoverable under Section 542. See Badami, 2011 WL 3812598, at *1 ("[T]he trustee's right to bring a turnover proceeding is created by . . . 11 U.S.C. § 542. This court is not deprived of subject matter jurisdiction simply because resolution of the lawsuit may require the application of state law."); In re Salander O'Reilly Galleries, 453 B.R. 106, 121 (Bankr. S.D.N.Y. 2011) ("The jurisdiction of the bankruptcy court depends on whether the issue to be decided arises in or under the Bankruptcy Code, such as whether a claim will be allowed, not whether state law is implicated."); see also In the Matter of Kakolewski, 29 B.R. 572, 573-74 (Bankr. W.D. Mo. 1983) ("By virtue of section 542(b), supra, an action [to collect an account receivable] is made to arise under bankruptcy law. And this is so even though actions on account and debt and contract generally arise under state law, for the provisions of section 542(b) are sufficient to arrogate the general law concepts and transform them into bankruptcy law."); 28 U.S.C. § 157(b)(3) ("A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by state law."). Based on the facts before the Court, Apex Express does not dictate the outcome in this case.

_____

[28] The Apex Express court noted that when a creditor files a proof of claim in a debtor's bankruptcy case, that creditor consents to the equitable jurisdiction of the bankruptcy court, even if the underlying matter is not core under the statute. 190 F.3d at 631 n.7. Since Betty and Tony have both filed proofs of claim, this court has constitutional authority under the logic of Apex Express to enter final judgment on the Trustee's claim, whether or not the turnover action is core under Section 157.

Having determined that the claim is core under the statute, the Court must next determine if these actions "stem[] from the bankruptcy itself or would necessarily be resolved in the claims allowance process." <u>Stern</u>, 131 S. Ct. at 2618. Since <u>Stern</u>, at least one court has found a turnover action to be a bankruptcy cause of action. <u>See</u> <u>In re McCrory</u>, 2011 WL 4005455, at *1 ("Proceedings involving the turnover of property of the bankruptcy estate are core proceedings that the court may hear and determine under 28 U.S.C. § 157(b)(1) and (b)(2)(E). The matter at issue is one that 'stems from the bankruptcy itself' that is within this court's jurisdiction to decide."). This conclusion is supported by the fact that actions for turnover occur exclusively under the Bankruptcy Code. <u>See In re Pegasus Gold Corp.</u>, 394 F.3d 1189, 1193 (9th Cir. 2004). As previously discussed, the Trustee's complaint states a valid claim for turnover. Pursuant to <u>Stern</u>, the Court has the constitutional authority to enter a final judgment regarding turnover proceedings.[29] In addition, because Tony and Betty have both filed proofs of claim for "monies loaned" by them to the Debtor, and the Trustee asserts that they owe money to the Debtor, the Court concludes that it will be necessary to resolve the Trustee's claims in the process of allowing or disallowing Tony's and Betty's proofs of claim.[30] Both prongs of the <u>Stern</u> test have been met. The Court may enter final

---

[29]This conclusion is reinforced by the fact that turnover actions pursuant to Section 542 are included with the list of avoidance and recovery actions in Section 502(d) that may form the basis of the disallowance of a claim. 11 U.S.C. § 502(d).

[30]<u>See</u> <u>In re Byce</u>, 2011 WL 6210938, at *2 (D. Idaho Dec. 14, 2011) (citing <u>In re Salander O'Reilly Galleries</u>, 435 B.R.106, 117 (Bankr. S.D.N.Y. 2011)) ("The bankruptcy court thus has the constitutional authority to finally determine JustMed's claim—including state-law issues that arise within that claim. <u>Stern</u> did not hold that the bankruptcy court may not rule on state law issues when determining a proof of claim."); <u>Fleury v. Specialized Loan Servicing, LLC</u>, 2011 WL 4851141, at *2 (Bankr. E.D. Cal. Oct. 6, 2011) ("The question, as framed by the Supreme Court in <u>Stern</u> is, whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process. Here, the validity of the deed of trust, which creates the secured claim, is an issue that would plainly be resolved in the claims allowance process."); <u>In re GB Herndon & Assocs., Inc.</u>, 459 B.R. 148, 164 (Bankr. D. Colo.

orders with regard to these claims.

### 4. Recovery of Estate Property as a General Partner of the Farm Affiliates Pursuant to Section 541 of the Bankruptcy Code and North Carolina Law

The Trustee alleges that the Debtor made various loans to the Farm Affiliates and that the outstanding balance of such loans totals $1,019,565.48, for which Tony and Betty are liable as general partners of the Farm Affiliates.[31]  The Trustee argues that this debt is property of the Debtor's estate pursuant to Section 541 of the Bankruptcy Code, and he seeks an order for Tony and Betty to turn over to the Trustee payment for the obligations of the Farm Affiliates.

Pursuant to the analysis in the previous section, the Court concludes that these causes of action are essentially turnover actions and are therefore core proceedings pursuant to 28 U.S.C. § 157(b)(2)(A), (C), (E), and/or (O).  Turnover actions are bankruptcy causes of action, so the first prong of the Stern test has been met.  In re McCrory, 2011 WL 4005455, at *1.  It is not necessary to determine if these claims of the Trustee must be resolved in the claims allowance process.  The Court may enter final orders with regard to these claims.

### 5. Breach of Fiduciary Duty

The Trustee alleges that Tony, as President and a director of the Debtor, and Betty, as Secretary and a director of the Debtor, owe a fiduciary duty to the Debtor and that they both breached this duty.  The Trustee further alleges that, upon the Debtor's insolvency, they owed a

---

2011) (debtor's counterclaims were necessarily resolved by resolution of creditor's proof of claim, such that court had authority to enter final order on debtor's counterclaims); In re Olde Prairie Block Owner, LLC, 457 B.R. 692, 698 (Bankr. E.D. Ill. 2011) (because debtor's counterclaims for (1) rescission of contract and (2) breach of contractual duty of good faith and fair dealing had to be resolved in the determination of creditor's proof of claim based on the contract, they were core proceedings subject to final adjudication by the bankruptcy court).

[31]The allegations are contained in count 12 against Tony and count 9 against Betty.

fiduciary duty to the Debtor's creditors generally.[32]  The Trustee seeks damages from Tony and Betty for their breach of these duties.

Tony and Betty filed proofs of claim, and these claims for breach of fiduciary duty could be characterized as counterclaims by the estate against them.[33]  But even if that supposition is correct, these claims are state law tort claims, and they do not stem from the Bankruptcy Code.  See State ex rel. Long v. ILA Corp., 132 N.C.App. 587, 513 S.E.2d 812 (N.C. App. 1999) (corporate fiduciary duties are codified in N.C. Gen. Stat. § 55-8-30(a), which "embodies long traditions of the common law.").  It will not be necessary to determine whether Tony and/or Betty breached any fiduciary duties to the Debtor or its creditors in order to allow their proofs of claim.[34]  These claims do not meet either prong of the Stern test.  The Court will issue proposed findings of fact and conclusions

---

[32]The allegations are contained in count 13 against Tony and count 10 against Betty.

[33]28 U.S.C. § 157(b)(2)(C) provides that counterclaims are core proceedings.

[34]See In re Ortiz, 665 F.3d 906, 914 (7th Cir. 2011) (filing proof of claim for medical services that revealed debtor's medical information did not allow bankruptcy court to enter final order on debtor's counterclaim that creditor violated state law because adjudicating creditor's claims did not require court to determine debtor's counterclaim); In re AIH Acquisitions, LLC, 2011 WL 4000894, at *3 (N.D. Tex. Sept. 7, 2011) (bankruptcy court could not enter final judgment on causes of action asserted by buyer of estate assets against lender that arose post-petition for fraudulent inducement and negligent misrepresentation because (1) they are state law counterclaims and (2) the court need not determine such claims in allowing buyer's proof of claim); In re Olde Prairie Block Owner, 457 B.R. at 699 (debtor's counterclaims did not need to be decided to rule on creditor's proof of claim, so they are not subject to final adjudication by the bankruptcy court); In re Sw. Sports Ctr., Inc., 2011 WL 4002559, at *7 (Bankr. N.D. Ohio Sept. 6, 2011) ("In this case, Kleem filed a proof of claim based on the judgment lien filed in the Cuyahoga County Records Office. The debtor filed its Adversary Proceeding alleging fraud, conspiracy and negligence-all state court claims alleged in the second state court case. The Bankruptcy Court's ruling on Kleem's proof of claim will not resolve the debtor's counterclaim. Thus this Court has no authority under the U.S. Constitution to enter a final judgment.").

of law regarding these claims.[35]  See also  In re Soporex, 463 B.R. at 363, 366 (bankruptcy court

_____

[35]While at least one bankruptcy court has determined that it has "no statutory authority to render findings of fact and conclusions of law for core proceedings that it may not constitutionally hear," Blixseth, 2011 WL 3274042, at *12, this Court will join the majority of courts that have concluded that Stern did not eliminate the ability of bankruptcy courts to issue such proposed findings and conclusions. See In re El-Atari, 2011 WL 5828013, at *3 (E.D. Va. Nov. 18, 2011) ("Even if a fraudulent conveyance action . . . has lost its vaunted status as a core proceeding, it is clearly 'related to a case under title 11.' As such, the bankruptcy court retains the authority to 'submit proposed findings of fact and conclusions of law' that the district court then considers before entering a final judgment. § 157(c)(1)."); Field v. Lindell ( In re Mortg. Store, Inc.), 464 B.R. 421, 427 (D. Hawai'i 2011) ("[T]he court has little difficulty in finding that Congress, if faced with the prospect that bankruptcy courts could not enter final judgments on certain 'core' proceedings, would have intended them to fall within 28 U.S.C. § 157(c)(1) granting bankruptcy courts authority to enter findings and recommendations."); Paloian v. Am. Express Co. (In re Canopy Fin., Inc.), 464 B.R. 770, 774 (N.D. Ill. 2011) ("[T]he [Stern] Court at least implied that the effect of its decision was to 'remove' certain claims from 'core bankruptcy jurisdiction,' and to relegate them to the category of claims that are merely 'related to' bankruptcy proceedings and thus subject to being heard, but not finally decided, by bankruptcy courts."); In re Byce, 2011 WL 6210938, at *4 ("A majority of district courts considering the issue hold that the bankruptcy courts retain the power to enter proposed findings and recommendations."); In re Republic Windows & Doors, LLC, 450 B.R. 511, 518 (Bankr. N.D. Ill. 2011) ("Nothing in [the Stern] decision can be read to preclude this Court from submitting proposed findings of fact and conclusions of law to the district court."); In re D & B Swine Farms, Inc., 2011 WL 6013218, at *2 (Bankr. E.D.N.C. Dec. 2, 2011) (rejecting Blixseth holding that bankruptcy court has no statutory authority to render proposed findings and conclusions); In re Soporex, Inc., 463 B.R. 344, 365 (Bankr. N.D. Tex. 2011) ("Stern did not strip the bankruptcy courts of the authority to hear these types of claims and to propose findings of fact and conclusions of law to the district court for de novo review."); In re Universal Mktg., Inc., 459 B.R. 573 , 578 (Bankr. E.D. Pa. 2011) ("Respectfully, I believe Blixseth is incorrect and I decline to follow it."); In re Bujak, 2011 WL 5326038, at *4 (Bankr. D. Idaho Nov. 3, 2011) ("The majority in Stern expressly noted that the creditor in that case had not argued that bankruptcy courts are barred from hearing all counterclaims against a creditor, nor from entering proposed findings and conclusions on such matters, which could then be submitted to a district court to 'finally decide' the issues.") (citing Stern, 132 S. Ct. at 2620); In re Heller Ehrman LLP, -- F.Supp.2d –, 2011 WL 4542512, at *6 (Bankr. N.D. Cal. Sept. 28, 2011) ("[T]he fact that Bankruptcy Rule 9033 only mentions non-core proceedings in no way prohibits following the same procedure in core matters.").  Recently the Blixseth court amended its earlier ruling.  In re Blixseth, 2012 WL 10193, at *8-10 (Bankr. D. Mont. Jan. 3, 2012) ("The Court sua sponte amends its August 1, 2011, Memorandum of Decision and Order. . . .  [S]everal courts have recently concluded that Stern v. Marshall does not deprive bankruptcy courts of subject matter jurisdiction. . . . [B]ecause the United States District Court for the District of Montana would have the requisite subject-matter jurisdiction to adjudicate the claims in this Adversary Proceeding, so too does this Court.").

lacks constitutional authority to enter final judgment on state law claims alleging breach of fiduciary duty, regardless of whether defendant filed proof of claim, but court has statutory authority to issue proposed findings of fact and conclusions of law to the district court.).

### 6. Chapter 75 of North Carolina General Statutes

The Trustee alleges in count 14 that the acts of Tony Dennis constitute unfair or deceptive trade practices under North Carolina law, for which the Trustee seeks damages.  Tony argues that the adjudication of this claim has nothing to do with the allowance of his proof of claim.  Further, he argues that because this claim is based on state law, it does not stem from the Debtor's bankruptcy.  This claim is a counterclaim by the estate against Tony.  Under 28 U.S.C. § 157(b)(2)(C), such  counterclaims are core proceedings.  However, the claim does not satisfy the first prong of the Stern test because it is a state law tort claim and does not stem from the Bankruptcy Code.  It is not necessary to determine whether Tony's actions constitute an unfair trade practice in order to allow or disallow his proof of claim for "monies owed."  The Court has no constitutional authority to enter a final order with regard to this claim, Stern, 131 S. Ct. at 2611, and will submit proposed findings of fact and conclusions of law.  See also Schatz v. Chase Home Fin. (In re Schatz), 452 B.R. 544, 552 (Bankr. M.D. Pa. 2011) (debtor's claim under Pennsylvania Unfair Trade and Consumer Protection Act was "non-core" proceeding because claims did not arise under any provision of the Bankruptcy Code, were not claims that could exist only in bankruptcy, and could have no effect on post-confirmation estate).  But see In re Carroll, 464 B.R. 293, 312-13 (Bankr. N.D. Tex. 2011) (court has constitutional authority to determine whether debtor-defendant was liable for violations of the Texas Deceptive Trade Practices Act where such determination was necessary to determine whether creditor's claim was dischargeable.).

32

### 7. Tony Dennis is the Alter Ego of Custom Wood

The Trustee alleges in count 15 that Custom Wood is a mere instrumentality of Tony Dennis, for which the Trustee seeks damages. This claim is a counterclaim by the estate against the proof of claim filed by Tony, and 28 U.S.C. § 157(b)(2)(C) provides that such counterclaims are core proceedings. The claim does not satisfy the first prong of the Stern test because it is a state law tort claim and does not stem from the Bankruptcy Code. It is not necessary to determine whether Tony and Custom Wood are alter egos of one another in order to allow Tony's proof of claim. The Court has no constitutional authority to enter a final order with regard to this claim and will submit proposed findings of fact and conclusions of law.

### 8. Unjust Enrichment

The Trustee alleges that the Debtor conferred the benefit of materials and labor on Custom Wood for no consideration. The Trustee also alleges the Debtor made cash transfers to the Farm Affiliates, to DLI, Stanly Timber, Tony, and Betty, all for no consideration.[36] The Trustee seeks damages from Tony and Betty for unjust enrichment.

This claim is a counterclaim by the estate against the proofs of claim filed by Tony and Betty, and 28 U.S.C. § 157(b)(2)(C) provides that such counterclaims are core proceedings. The claim does not satisfy the first prong of the Stern test because it is a state law tort claim and does not stem from the Bankruptcy Code. The claim also fails the second prong of the Stern test because it is not necessary to determine whether Tony and Betty were unjustly enriched in order to allow or disallow their proofs of claim. The Court has no constitutional authority to enter a final order with regard to this claim and will submit proposed findings of fact and conclusions of law.

---

[36]The allegations are contained in count 16 against Tony and count 11 against Betty.

33

### 9. Accountings

In count 17, the Trustee seeks an accounting from Tony concerning transactions between the Debtor and Stanly Timber, Custom Wood, and the Union County Partnership. This claim is not a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The Court will submit proposed findings of fact and conclusions of law. See 28 U.S.C. § 157(c)(1).

### 10. Equitable Subordination of Claims Pursuant to Section 510(c) of the Bankruptcy Code

The Trustee alleges that the acts, omissions, and conduct of Tony and Betty resulted in injury to the Debtor and its creditors and constitute a basis for equitably subordinating their claims, including Claim No. 105 and Claim No. 129, against the bankruptcy estate pursuant to Section 510(c) of the Bankruptcy Code.[37]

This claim is a counterclaim by the estate against the proofs of claim filed by Tony and Betty, and 28 U.S.C. § 157(b)(2)(C) provides that such counterclaims are core proceedings. The claim satisfies the first prong of the Stern test because a claim for equitable subordination stems from Section 510(c) of the Bankruptcy Code. In re USDigital, Inc., 461 B.R. 276, 285 (Bankr. D. Del. 2011) (equitable subordination action under Section 510(c) is nonenumerated core proceeding); Samson v. Blixseth (In re Blixseth), 2011 WL 3274042, at *11 (Bankr. D. Mont. Aug. 1, 2011) ("the equitable subordination . . . claim[] arise[s] from the Bankruptcy Code . . . , therefore, this Court's jurisdiction over [the] claim[] is constitutionally acceptable."). The Court has the constitutional authority to enter a final order with regard to this claim.

### 11. Disallowance of Claim No. 129 and Claim No. 105

In count 19, the Trustee objects to Claim No. 129 filed by Tony, which alleges a debt to him

---

[37]The allegations are contained in count 18 against Tony and count 12 against Betty.

of $348,467.65, and requests that it be disallowed. In count 13, the Trustee objects to Claim No. 105 filed by Betty, which alleges a debt to her of $1,049,367.02, and requests that it be disallowed.

These claims are counterclaims by the estate against the proofs of claim filed by Tony and Betty, and 28 U.S.C. § 157(b)(2)(C) provides that such counterclaims are core proceedings. They satisfy the second prong of the <u>Stern</u> test because it is necessary to adjudicate them in order to allow or disallow the proofs of claim of Tony and Betty. The Court has the constitutional authority to enter a final order with regard to these claims.

**C.    The Trustee's Causes of Action Against DLI and Maria Dennis**

Neither DLI nor Maria Dennis filed proofs of claim against the Debtor. The Court will consider the claims in the two adversary proceedings (Nos. 11-6035 and 11-5037) that the Trustee has filed against them and determine, pursuant to <u>Stern</u>, whether it can enter a final judgment regarding each cause of action that the Trustee asserts.

### 1. Fraudulent Conveyance Claims Pursuant to Section 544(b) of the Bankruptcy Code and N.C. Gen. Stat. § 39-23.4 and Pursuant to Section 548 of the Bankruptcy Code

The Trustee asserts four claims against DLI and Maria based on Section 544(b) and N.C. Gen. Stat. § 39-23.4, or based on Section 548.[38] The Trustee alleges that collectively they received various transfers from the Debtor totaling over $867,000.00. DLI and Maria argue that the adjudication of these fraudulent conveyance claims has nothing to do with the allowance of proofs of claim. They also argue that the Trustee's claims are based on state fraudulent conveyance law, so they do not stem from the Debtor's bankruptcy. They maintain that the Court may only submit proposed findings of fact and conclusions of law pursuant to 28 U.S.C. § 157(c)(1).

These claims are fraudulent conveyance actions pursuant to Sections 544(b) and 548 of the

---

[38]These include counts 1 and 2 against DLI and counts 1 and 2 against Maria Dennis.

Bankruptcy Code.  28 U.S.C. § 157(b)(2)(H) provides that "proceedings to determine, avoid, or recover fraudulent conveyances" are core proceedings.  The second prong of the <u>Stern</u> test cannot be satisfied because neither DLI nor Maria filed a proof of claim.  But do such claims satisfy the first prong of the <u>Stern</u> test?  Do they stem from the Bankruptcy Code?  These are questions as to which reasonable minds have already differed.  <u>Cf.</u> <u>In re Heller Ehrman LLP</u>, 2011 WL 6179149, at *3-5 (bankruptcy court lacks constitutional authority to enter final judgment on fraudulent conveyance claim), <u>with</u> <u>Burtch v. Seaport Capital, LLC et al. (In re Direct Response Media, Inc.)</u>, -- B.R. --, 2012 WL 112503 (Bankr. D. Del. Jan. 12. 2012) (bankruptcy court may enter final judgment on fraudulent conveyance claim).  It is obvious that Sections 544(b) and 548 are part of the Bankruptcy Code, and it appears at first blush that they must be bankruptcy causes of action.  However, history teaches otherwise.[39]

Prior to the founding of this country, fraudulent conveyances had long been decided in English courts of law through the application of the common law.  "The first major statutory codification of the common law of fraudulent conveyances is that of 13 Elizabeth I Ch. 5 (1570)." <u>Duck v. Munn</u>, 823 F.2d at n.2; <u>see</u> <u>Granfinanciera</u>, 492 U.S. at 43 ("There is no dispute that actions to recover preferential or fraudulent transfers were often brought at law in late 18th-century England.").  The English distinction between courts of law and courts of equity was continued under the Bankruptcy Act of 1898, with district courts exercising plenary jurisdiction over actions to augment the bankruptcy estate and bankruptcy courts exercising summary jurisdiction over actions to allow claims, divvy up assets, and adjust the debtor/creditor relationship.  "[A] trustee's avoidance

---

[39]"Although § 1334(b) defines bankruptcy jurisdiction broadly, history demonstrates the Supreme Court's concern with containing the power of a bankruptcy court—a non-Article III tribunal."  <u>Zahn v. Yucaipa Capital Fund (In re Almac's)</u>, 202 B.R. 648, 659 (D.R.I. 1996).

actions to, e.g., avoid and recover preferential transfers and fraudulent conveyances were not within the summary jurisdiction of referees; rather, such avoidance actions had to be brought by plenary suit in an Article III court with Seventh Amendment jury trial rights" Brubaker, Part II, at *35. This dichotomy is based on the fact that

> [b]ankruptcy jurisdiction, at its core, is in rem. That was as true in the 18th century as it is today. Then, as now, the jurisdiction of courts adjudicating rights in the bankrupt estate included the power to issue compulsory orders to facilitate the administration and distribution of the res.

Cent. Va. Cmty. College v. Katz, 546 U.S. 356, 362 (2006) (citation omitted).

In 1989, the Supreme Court decided Granfinanciera, holding "that common-law actions to augment the size of the estate involving disputed facts to be determined by a jury are not core, as opposed to actions to divvy up and order claims against the estate, which are [core]." Fairfield Sentry, 458 B.R. at 688 (citing Granfinanciera, 492 U.S. at 56). The majority opinion in Stern relied on the distinction drawn in Granfinanciera between actions "to augment the bankruptcy estate" and actions to determine a creditor's right to receive "a pro rata share in the bankruptcy res," ultimately concluding that bankruptcy courts have the constitutional authority to enter final judgments in the latter, but not in the former, causes of action. See Klee, supra note 12, at *4.

Fraudulent conveyance actions are common law actions that were decided by courts of law in England and by district courts under the Bankruptcy Act of 1898. Fraudulent conveyance suits are "quintessentially suits at common law that more nearly resemble state law contract claims brought by a bankrupt corporation to augment the bankruptcy estate than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res." Granfinanciera, 492 U.S. at 55–56. "11 U.S.C. § 548 is aimed only at such conveyances as would be fraudulent and voidable under common law or under the statute of 13 Elizabeth." Duck v. Munn, 823 F.2d at n.2; In re

37

Davis, 2011 WL 5429095 at *11 ("Section 548(a)(1) merely codifies the action for fraudulent conveyance that has been part of the common law since at least Twyne's Case, 3 Coke 80b, 76 Eng. Rep. 809 (Star Chamber, 1601)."). Section 544 incorporates "applicable law," meaning state fraudulent conveyance law, which itself is patterned on the common law. "The Uniform Fraudulent Conveyance Act, approved by the National Conference of Commissioners on State Laws in 1918, is essentially a restatement of the statute of 13 Elizabeth. States which have not adopted the Uniform Fraudulent Conveyance Act or a similar version of the statute of 13 Elizabeth have recognized the statute of 13 Elizabeth as part of the common law." Id. In addition, fraudulent conveyance claims are private rights and do not fall within the public rights exception.[40]

Thus, fraudulent conveyance actions under Section 544(b) and Section 548 do not "stem from the Bankruptcy Code" in the context of applying the second prong of the Stern test. Bankruptcy courts may not enter final orders in fraudulent conveyance actions, at least where the defendant has not filed a proof of claim. McFarland v. Leyh (In re Tex. Gen. Petrol. Corp.), 52 F.3d 1330, 1336-37 (5th Cir. 1995) ("Congress has designated fraudulent conveyance actions as core proceedings. Thus, because bankruptcy courts have the power to adjudicate core proceedings and because fraudulent conveyance actions are labeled as such, a bankruptcy court might assume that it has plenary authority to decide fraudulent conveyance actions. As it turns out, that court would

---

[40] Stern, 131 S. Ct. at 2614 (the Granfinanciera court "rejected a bankruptcy trustee's argument that a fraudulent conveyance action filed on behalf of a bankruptcy estate against a non-creditor in a bankruptcy proceeding fell within the 'public rights' exception."); Adelphia Recovery Trust v. FLP Grp., Inc., 2012 WL 264180 (S.D.N.Y. Jan. 30, 2012) ("These Supreme Court precedents demonstrate that a fraudulent transfer claim involves a private right."); Dev. Specialists, Inc. v. Orrick, Herrington & Sutcliffe, LLP, 2011 WL 6780600, at *2 (S.D.N.Y. Dec. 23, 2011) (Granfinanciera eliminated any "debate" about whether fraudulent conveyance claims involve a private or a public right; it is the former); In re Quality Props., LLC, 2011 WL 6161010 at *5 (Bankr. N.D. Ala. Nov. 29, 2011) (fraudulent conveyance claims involve private rights).

be mistaken."); Stettin v. Regent Capital Partners, LLC. (In re Rothstein, Rosenfeldt, Adler, P.A.), No. 11-62612-CIV-MARRA, slip op. at *3 (S.D. Fla. Mar. 7, 2012) (bankruptcy court has no authority to enter final order in fraudulent conveyance action); Blixseth v. Brown, -- F. Supp. 2d --, 2012 WL 691598 (D. Mont. Mar. 5, 2012) ("The Bankruptcy Court . . . reasoned that, under Stern, it could not issue a final judgment on the fraudulent conveyance claim . . . . To that extent, in my view, the Bankruptcy Court's reading of Stern is correct."); In re Heller Ehrman LLP, 2011 WL 6179149, at *3-5 ("By likening the claim in question explicitly to the fraudulent conveyance claims in Granfinanciera, this Court believes that Stern clearly implied that the bankruptcy court lacks constitutional authority to enter final judgment on the fraudulent conveyance claims presented here."); In re El-Atari, 2011 WL 5828013, at *2 ("Stern, together with Granfinanciera, clearly supports the conclusion that the authority to issue a final decision in a fraudulent conveyance action is reserved for Article III courts."); Dev. Specialists, Inc. v. Akin Gump Strauss Hauer & Feld LLP, 462 B.R. 457, 469 (S.D.N.Y. 2011) ("Only in Stern did the Court actually hold that a fraudulent conveyance action implicating private rights must be finally determined in an Article III forum."); In re Canopy Fin., Inc., 464 B.R. 770, 773 (N.D. Ill. 2011) ("Thus, by likening the claim in question to the fraudulent conveyance claims in Granfinanciera, the Stern Court made clear that the Bankruptcy Court lacks constitutional authority to enter final judgment on the [fraudulent conveyance] claims presented here."); Sitka Enters., Inc. v. Segarua-Miranda, No. 10-1847CCC, 2011 U.S. Dist. LEXIS 90243,*8 (D.P.R. Aug.12, 2011) ("[T]he fraudulent conveyance action brought by the trustee cannot be adjudicated by the Bankruptcy Court, a non-Article III court, for lack of constitutional authority to do so. Such action, in compliance with Article III, must be adjudicated by the U.S. District Court."); Zahn, 202 B.R. at 658–59 ("Therefore, this Court concludes that the power to enter a final decision over Counts I and II [fraudulent conveyance

actions] must rest with an Article III tribunal."); In re Davis, 2011 WL 5429095 at *11 (Bankr. W.D. Tenn. Oct. 5, 2011) (fraudulent conveyance action "is a matter of private right that cannot constitutionally be determined . . . by a non-Article III tribunal."); Hagan v. Freedom Fid. Mgmt. (In re Fife), 2011 Bankr.Lexis 3544, at *1 (Bankr. W.D. Mich. Aug. 22, 2011) ("Trustee has filed a complaint to recover a fraudulent conveyance . . . [I]n light of the recent U.S. Supreme Court decision Stern v. Marshall, the court is submitting this Report and Recommendation to the District Court for the entry of judgment."); Teleservs. Grp., 456 B.R. at 338 ("Stern, coupled with the Court's earlier decision in Murray's Lessee, is all that is needed to realize that the taking that Trustee has in mind in this [fraudulent transfer] adversary proceeding requires the oversight of a judicial officer with the independence that is only guaranteed by life tenure and salary protection."); Springel v. Prosser (In re Innovative Commc'n Corp.), 2011 WL 3439291, at *3 (Bankr. D.V.I. Aug. 5, 2011) (in spite of 28 USC § 157(b)(2)(H), court may not enter final order in fraudulent conveyance cause of action based on § 544(b) and state law); Samson v. Blixseth, 2011 WL 3274042, at *4,*11 (although fraudulent transfer claim "involves substantive rights created under bankruptcy law," because it "is essentially a common law claim attempting to augment the estate, does not stem from the bankruptcy itself and would not be resolved in the claims allowance process, it is a private right that must be adjudicated by an Article III court."); BAXTER ET AL., supra, at 9 ("Thus, similar to the holding in Stern that the authority conferred by § 157(b)(2)(C) is unconstitutional, the argument can be made that the  classification of all fraudulent conveyance actions as core proceedings under § 157(b)(2)(H)  violates Article III of the Constitution. Indeed, the Court in Stern stated that it saw 'no reason  to treat Vickie's counterclaim any differently from the fraudulent conveyance action in Granfinanciera.'"); Brubaker, Part II, at *37 ("After Stern v. Marshall, the conclusion seems inescapable that such core jurisdiction to enter final judgment-expressly conferred by § 157(b)(2)(F)

& (H) of the Judicial Code-is unconstitutional. Without consent of the litigants, a bankruptcy judge can do no more than hear the action and submit proposed findings and conclusions to the district court."); Gibson, supra note 28, at 168 ("Congress may not assign [the] adjudication [of a fraudulent conveyance action] to the non-article III bankruptcy court. Such assignment would be prohibited whether or not the parties demanded a jury trial, because in either event the action would involve private rights, thus necessitating adjudication by an article III court.") (footnotes omitted).

The Court realizes that there are well-reasoned opinions that have reached the opposite conclusion, adopting what has been called the "narrow view."  See, e.g., Burtch v. Seaport Capital, 2012 WL 112503; In re US Digital, Inc., 2011 WL 6382551.  These courts make various observations in support of the narrow view, one of which is that bankruptcy courts have entered final judgments in fraudulent transfer actions for many years. The District Court for Rhode Island responded to this argument in Zahn v. Yucaipa Capital Fund (In re Almac's), 202 B.R. 648 (D.R.I. 1996):

> Although this Court is mindful of the many cases holding that fraudulent transfer claims are core proceedings subject only to normal appellate review, see, e.g., In re Wedtech, 81 Bankr. 237 (Bankr.S.D.N.Y.1987); it is also mindful of the Supreme Court's words of caution in Thomas v. Union Carbide: "practical attention to substance rather than doctrinaire reliance on formal categories should inform application of Article III." Id. at 587.

Id. at 658–59.

Another observation cited in support of the narrow view is that the majority opinion in Stern did not address fraudulent conveyances, and specifically stated that its holding was narrow.[41]  See

---

[41]In announcing the holding, the Supreme Court stated that "Congress, in one isolated respect, exceeded [the Article III] limitation in the Bankruptcy Act of 1984." Stern, 131 S. Ct. at 2620. See In re Custom Contractors, LLC, – B.R. –, 2011 WL 6046397, at *4 (Bankr. S.D. Fla. Dec. 5, 2011) ("The Stern Court did not directly address the authority of bankruptcy courts to enter final orders in fraudulent conveyance actions and explicitly intended its decision to be read

In re Heller Ehrman LLP, 2011 WL 6179149, at *2 ("While fraudulent conveyance actions are also designated as 'core' in the bankruptcy statute, they were not at issue in Stern.  Thus, the question is whether the holding of Stern applies to other 'core' matters in the statute. Upon examination, the Court determines the reasoning of Stern does apply to the fraudulent conveyance claims in this case, and that the bankruptcy court cannot enter a final judgment on these claims."); Id. at *3 ("Whether Stern should be read to hold that bankruptcy judges do not have constitutional authority to enter final judgments in fraudulent conveyance actions turns on whether the court applies only the strict dictate of the holding, or rather looks to the thrust of the reasoning the Court used in coming to that holding."). Although fraudulent conveyances were not addressed by Stern, that does not mean that the Stern analysis should not be applied to other provisions of 28 U.S.C. § 157(b)(2).  See In re Davis, 2011 WL 5429095, at *13 ("Other bankruptcy judges believe that Stern is to be limited solely to the particular core proceeding at issue there: a counterclaim by the estate against a person filing a claim against the estate. For the reasons cited in this report, I do not agree with the conclusion of these bankruptcy judges.") (citations  omitted);  Erwin Chemerinsky,  Formalism without a Foundation: Stern v Marshall, 1 (Jan. 4, 2012) (forthcoming in SUP. CT. REV.) ("The Supreme Court's recent decision in Stern v Marshall, has a narrow holding, but potentially enormous implications for bankruptcy courts and litigation in the federal courts."); Id. at 40 ("The majority opinion in Stern v Marshall does give a clear indication as to its scope and it is far broader than Chief Justice Roberts' conclusion acknowledged."); see also Paloian, 2011 WL 3911082, at *2 ("Stern's breadth is made apparent by the Court's reliance in that case on [Granfinanciera].").

Another observation of courts that take the narrow view of Stern is that the broader view

narrowly.").

restructures the division of labor between district courts and bankruptcy courts by requiring that district courts hear most adversary proceedings. The Supreme Court, however, did not believe the holding in <u>Stern</u> would have this effect.[42] Because a bankruptcy court clearly has jurisdiction over fraudulent conveyance causes of action, it may hear such matters as usual—the only difference is that the document produced by the bankruptcy court should be titled "Proposed Findings of Fact and Conclusions of Law" and not "Judgment." <u>Stern</u> might result in more work for litigants, who may elect to file written objections to the proposed findings and conclusions of the bankruptcy court.[43] <u>See</u> FED. R. BANKR. P. 9033(b). District courts, too, may face more work, insofar that they may need to conduct a de novo review of any findings or conclusions to which a party objects. <u>See</u> FED. R. BANKR. P. 9033(d). But <u>Stern</u> does not require that district courts try fraudulent conveyance actions. Even if it did, utility and convenience cannot save 28 U.S.C. § 157(b)(2)(H) if its application to a fraudulent conveyance action in which the defendant did not file a proof of claim is unconstitutional.[44]

---

[42]"In addition, we are not convinced that the practical consequences of such limitations on the authority of bankruptcy courts to enter final judgments are as significant as Vickie and the dissent suggest." <u>Stern</u>, 131 S. Ct. at 2619.

[43]Of course, litigants may avoid this extra work by consenting to the entry of a final order by the bankruptcy court. A majority of courts have concluded that "the bankruptcy court has the authority to render final judgments even in non-core proceedings with the consent of the parties." <u>In re Freeway Foods</u>, 2012 WL 112192, at *12 (citing <u>In re Pro-Pac, Inc.</u>,456 B.R. 894, 902-903 (Bankr. E.D. Wis. 2011) (collecting cases)).

[44]"It goes without saying that 'the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution.' <u>INS v. Chadha</u>, 462 U.S. 919, 944, 103 S. Ct. 2764, 77 L.Ed.2d 317 (1983)." <u>Stern</u>, 131 S. Ct. at 2619; <u>Granfinanciera</u>, 492 U.S. at 63. "The recognition of the utility and convenience of administrative agencies for the investigation and finding of facts within their proper province, and the support of their authorized action, does not require the conclusion that there is no limitation of their use, and that the Congress could completely oust the courts of all determinations of fact by vesting the authority to make them

Because the Court does not have constitutional authority to enter a final order regarding this claim, the Court will issue proposed findings of fact and conclusions of law.

### 2. Unjust Enrichment

The Trustee alleges that the Debtor made cash transfers to DLI for no consideration. He also alleges that DLI unfairly exploited the Debtor for its own benefit. The Trustee seeks damages for unjust enrichment and a constructive trust on DLI's assets until such damages are paid. DLI argues that this claim is based on state law, so it does not stem from the Debtor's bankruptcy.

This claim is not a core proceeding pursuant to 28 U.S.C. § 157(b)(2). It is, however, "related to" the Debtor's bankruptcy pursuant to 28 U.S.C. § 157(c)(1). Because this claim is not a core proceeding, the Stern test does not apply. The Court has no constitutional authority to enter a final order with regard to this claim and will submit proposed findings of fact and conclusions of law.

## IV. CONCLUSION

The Court has the authority to enter final judgments with regard to certain causes of action in these adversary proceedings and must propose findings of fact and conclusions of law with regard to others. The Court can enter final judgments in all of the fraudulent conveyance and preference causes of action asserted by Trustee against Tony, Betty, and Chris. The Court can also enter final judgments in all causes of action to recover estate property from Tony and Betty. The Court can enter final judgments in all causes of action to subordinate or disallow the claims of Tony and Betty. The Court will submit proposed findings of fact and conclusions of law in all other causes of action asserted against Tony and Betty. Finally, the Court will submit proposed findings of fact and

---

with finality in its own instrumentalities or in the executive department." Crowell v. Benson, 285 U.S. 22, 56-57 (1932).

conclusions of law in all causes of action asserted against Maria and DLI.

    This opinion constitutes the Court's findings of fact and conclusions of law.  Separate orders shall be entered pursuant to Fed. R. Bankr. P. 9021.

March 27, 2012